U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

*[Signature: Barbara J. Houser]*

**United States Bankruptcy Judge**

**Signed July 20, 2010**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| AVNER SAMUEL AND CELESTE SAMUEL, | § | Case No. 09-37817-bjh7 |
| | § | |
| DEBTORS. | § | |
| | § | |
| FRANKFORD CROSSING SHOPPING CENTER DALLAS, TX. LIMITED PARTNERSHIP, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | Adversary No. 10-03029 |
| v. | § | |
| | § | |
| AVNER SAMUEL AND CELESTE SAMUEL, | § | |
| | § | |
| DEFENDANTS. | § | |

# FINDINGS OF FACT AND CONCLUSIONS OF LAW

Following a trial of this non-discharageability action on July14, 2010, the Court issues the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

**Procedural Facts**

1. The Complaint commencing this adversary proceeding was brought pursuant to Federal Rule of Bankruptcy Procedure 7001 and 11 U.S.C. § 523.

2. This Court has jurisdiction over the subject matter of the Complaint pursuant to 28 U.S.C. §§ 1334 and 157.

3. The matters raised in the Complaint constitute core proceedings within the meaning of 28 U.S.C. § 157(b)(2)(A), (I) and (O).

4. This Court has venue of these proceedings pursuant to 28 U.S.C. § 1409.

5. The Debtors, Avner Samuel ("Avner") and Celeste Samuel ("Celeste"), filed a Voluntary Petition under Chapter 7 of the Bankruptcy Code on November 16, 2009, thereby commencing the underlying bankruptcy case (the "Case").

6. On February 3, 2010 Celeste appeared and had her examination taken under oath and duly recorded by a certified court reporter in accordance with Federal Rule of Bankruptcy Procedure 2004 (the "Celeste Exam").

7. On February 3, 2010 Avner appeared and had his examination taken under oath and duly recorded by a certified court reporter in accordance with Federal Rule of Bankruptcy Procedure 2004 (the "Avner Exam").

8. The Discharge of Debtors was entered in the Case on June 3, 2010.

**Substantive Facts**

9.      Plaintiff Frankford Crossing Shopping Center Dallas, TX, L.P. ("Plaintiff" or "Frankford Crossing") is a Delaware limited partnership authorized to do business in the State of Texas.

10.     Plaintiff owns a shopping center in Dallas, Texas called Frankford Crossing Shopping Center (the "Shopping Center"), which leases space to various businesses.

11.     Avner is one of the joint Debtors in the Case.

12.     Celeste is and has been Avner's wife at all material times, and is the other joint Debtor in the Case.

13.     Avner obtained two culinary degrees, one in Jerusalem in the 1970s and another in Paris in the late 1970s or early 1980s. While Avner has these two culinary degrees, he has little other formal education.

14.     Celeste's educational background was not addressed in the evidence.

15.     Avner has been a chef for over 35 years and was a chef at all times relevant to this suit.

16.     For at least the last decade, the Debtors have together pursued, opened and engaged in managing various restaurant business ventures.

17.     Prior to and after August 18, 2006 (the "Relevant Date"), Avner and Celeste have been cooperating as a team in handling both their personal finances and business affairs, with Avner's professional activities mainly consisting of working as a chef and Celeste's mainly consisting of handling business and financial matters.

18.     Prior to and after the Relevant Date, Avner authorized and directed Celeste to read, complete and fill out documents out on his behalf.

19.  Prior to the Relevant Date, Celeste filled out documents and signed documents on Avner's behalf, and did so with Avner's knowledge.

20.  In the first half of 2006, the Debtors were involved in Urban Bistro Frankford, LLC ("Urban Bistro"), which sought to start and operate a high end restaurant in Dallas, Texas. Celeste owned a 1/3 interest in Urban Bistro. Avner did not own an interest in Urban Bistro, but would be an employee of Urban Bistro and would be the restaurant's chef when it opened. The other interests in Urban Bistro were owned by Josh Lankford and Mark Lindburg.

21.  The Debtors obtained the assistance of a commercial real estate broker, John Phelps ("Phelps"), to help locate space for Urban Bistro to lease.

22.  Suitable space was found in the Shopping Center owned by Plaintiff.

23.  Plaintiff's leasing manager, Mark Edwin Johnston ("Johnston"), was responsible for negotiating the terms of a possible lease of space in the Shopping Center for Urban Bistro with Phelps.

24.  Johnston dealt with Phelps in negotiating the terms of that lease and in negotiating a personal guaranty of the Debtors (the "Guaranty") and a personal guaranty of Lankford (collectively, the "Guaranties").

25.  Johnston told Phelps that the Guaranties would be required before a lease would be approved by Plaintiff.

26.  To assess the Debtors' financial condition, Plaintiff required the Debtors to provide a written financial statement prior to executing the Lease.

27.  The Debtors knew prior to the Relevant Date that the Plaintiff would require written financial statements from the Debtors and Lankford, along with the Guaranties, before the Plaintiff would enter into a lease with Urban Bistro.

**Findings of Fact and Conclusions of Law**

28. Johnston provided a blank financial statement form for the Debtors to complete, sign and return to Plaintiff. Boxes appear at the bottom of the financial statement form for Avner and Celeste to initial.

29. Celeste filled out the financial statement form as part of her business responsibilities for the Debtors. Avner knew Celeste was filling out the form for them.

30. On August 18, 2006, Celeste signed the completed financial statement (the "Financial Statement") on behalf of herself, and likely signed it on behalf of Avner.

31. On or about August 18, 2006, Avner initialed the completed and signed Financial Statement.

32. Dance, Bigelow, Sharp & Company (the "CPA") represented the Debtors as their certified public accountants ("CPA") in both their personal and business affairs.

33. The CPA was the Debtors' accountant from 2003 through at least 2007.

34. The Debtors did not consult the CPA in relation to the preparation of the Financial Statement.

35. Section three of the Financial Statement required the Debtors to list all of their assets and liabilities.

36. As of and before the Relevant Date, Celeste understood the difference between an asset and a liability.

37. Celeste defined an asset as something that belongs to you and a liability as something you owe.

38. The Financial Statement contained a place for the Debtors to list the amount of their retirement accounts.

39. As of the Relevant Date, the Debtors had retirement accounts worth approximately

**Findings of Fact and Conclusions of Law**

$501,426.58 that were and are exempt property.

40.     The Debtors did not list any retirement accounts on the Financial Statement, and thereby falsely represented that they had no retirement accounts.

41.     The Financial Statement contained a place for the Debtors to list the amount of their personal property.

42.     The Debtors listed personal property on the Financial Statement at an amount of $550,000.00.  This amount included the $501,426.58 in the Debtors' retirement accounts.

43.     As of the Relevant Date, the Debtors had less than $50,000.00 worth of non-retirement account personal property.

44.     By failing to separate their retirement accounts from other personal property on the Financial Statements, the Debtors overstated their non-retirement account personal property (and therefore their non-exempt assets) by approximately $500,000.00 on the Financial Statement, and this representation was false.

45.     The Financial Statement contained a place for the Debtors to list their liabilities.

46.     The Debtors listed only their mortgage liability of $309,000.00 on the Financial Statement.

47.     At the time the Debtors provided the Financial Statement, they had contingent liability on a guaranty of a business loan in the principal amount of $346,700.00 relating to an entity called YAFA-II, Inc. (the "YAFA II Loan" and the "YAFA II Guaranty").  YAFA-II, Inc. owned another restaurant operated by the Debtors.

48.     No evidence was introduced regarding the status of the YAFA II Loan when the Financial Statement was provided to Plaintiff.  The Court does not know if the YAFA II Loan was in default at the time the Financial Statement was provided to Plaintiff.

49.     The Debtors represented on the Financial Statement that they had no non-mortgage debt,

**Findings of Fact and Conclusions of Law**

and such representation was false.

50. The Financial Statement contained a place for the Debtors to list Avner's income and a place to list Celeste's income.

51. On the Financial Statement, the Debtors listed Avner's income at $125,000.00 and Celeste's income at $125,000.00, for a combined income of $250,000.00. The documentary evidence and/or the testimony at trial established that the Debtors did not have income this high in 2004, 2005 or 2006.

52. The amount of income listed by the Debtors on the Financial Statement exceeded their actual income in 2006 by approximately $100,636.00. The amount of income listed for the Debtors on their Financial Statement was false.

53. The foregoing described false representations regarding the Debtors' retirement accounts, the amount of their non-retirement account personal property, their liabilities, and their income are collectively referred to hereafter as the "False Representations".

54. Each of the False Representations was material.

55. The False Representations gave a substantially untruthful picture of the Debtors' financial situation.

56. The Debtors returned or caused to be returned the signed Financial Statement to the Plaintiff.

57. While the Financial Statement contained the False Representations, there were certain "red flags" in the Financial Statement that should have caused Johnston to wonder about the accuracy of the Financial Statement. For example, no bank accounts were shown on the Financial Statement, no debt other than the mortgage was shown, and Johnston had copies of the Debtors' tax returns for 2004, 2005, and 2006 and knew, or should have known, that the income stated on

**Findings of Fact and Conclusions of Law**

the Financial Statement was substantially incorrect. Moreover, Johnston testified that he ran a credit report on the Debtors. Although that credit report was not introduced into evidence at trial, it appears that Johnston was aware that the Debtors had other debt not disclosed on the Financial Statement. Notwithstanding these obvious problems with the Financial Statement, Johnston made no effort to discuss the contents of the Financial Statement with the Debtors.

58. Although Johnston testified that he relied on the Financial Statement in recommending that Plaintiff enter into the Lease with Urban Bistro, there is no evidence in the record regarding whether the ultimate decision-maker for Plaintiff relied upon the Financial Statement in deciding to enter into the Lease with Urban Bistro.

59. Further explanation is required. The evidence at trial clearly established that Johnston, as leasing manager for the Shopping Center, had authority to (i) negotiate the Lease, and (ii) decide whether he would recommend approval of the Lease. The record is equally clear that if Johnston decided that the transaction was not appropriate for any reason, he could "kill" it and the prospective tenant would have no further recourse. However, the record is also clear that Johnston did not have the authority to enter into any lease, including the Lease, on Plaintiff's behalf. In short, Johnston was not the ultimate decision-maker with respect to a decision to enter into a lease with a prospective tenant. And, the ultimate decision-maker for Plaintiff was not identified and did not testify at trial. So, there is no evidence in the record as to what the ultimate decision-maker for Plaintiff relied upon in deciding to execute the Lease on Plaintiff's behalf.

60. Regarding the Debtors' intent to deceive, the Court will consider Avner and Celeste separately. Other than his culinary training, Avner has only a third grade education. He does not read well. While Avner initialed each page of the Lease (including the Financial Statement), he did not prepare the Financial Statement and it is unclear if (i) he could read it, (ii) he understood its

**Findings of Fact and Conclusions of Law**

contents, or (iii) Celeste explained its contents to him. Accordingly, on this record, the Court cannot find that Avner knew he made the False Representations or that he made the False Representations with the intent to deceive.

61.     The question of Celeste's intent to deceive is more difficult. She testified that she put down the higher income figures on the Financial Statement because that was the income that Avner and she were supposed to receive, although they did not ultimately receive it. She further testified that while she failed to list their retirement accounts separately from their other personal property on the Financial Statement, she did not know that the accounts were exempt property or the significance of why the Plaintiff may have wanted the retirement accounts listed separately from their other personal property. And, while she did not list any other liabilities (other than the home mortgage) on the Financial Statement, she testified that she believed they were included in the amount of living expenses she included on the Financial Statement. Finally, she testified that she did not intend to mislead or deceive Plaintiff when she provided the Financial Statement.

62.     There is no question that Celeste was careless in preparing the Financial Statement. She did not consult with the Debtors' CPA in filling out the form and did not take sufficient care or time in preparing the document.

63.     However, based upon the Court's observations of her and after carefully considering the aggregate of her testimony and the evidence, the Court finds that she did not submit the Financial Statement to Plaintiff with the intent to deceive Plaintiff.

64.     Upon receiving the signed Financial Statement, Johnston prepared the lease closing documents (the "Closing Documents").

65.     To create the Closing Documents, Johnston prepared a form of the Lease, and assembled the Lease form with exhibits thereto, including the signed, completed Financial Statement into a

**Findings of Fact and Conclusions of Law**

single document paginated from 1 to 42. Johnston delivered the Closing Documents and the Guaranties to Phelps to be duly executed by the required parties, including the Debtors.

66.　On October 3, 2006, Urban Bistro executed the Lease. On October 3, 2006, Celeste signed her initials on each of the Closing Documents pages, and signed and notarized the Guaranty. On October 3, 2006, Avner signed his initials on each of the Closing Documents pages, and signed and notarized the Guaranty.

67.　The Debtors understood at the time the Closing documents were executed and initialed that they were going to be delivered to Plaintiff

68.　Plaintiff accepted and executed the Lease and leased space to Urban Bistro.

69.　Plaintiff provided valuable property, services and/or credit pursuant to the Lease.

70.　Urban Bistro subsequently defaulted on the Lease.

71.　Plaintiff filed suit in the State of New York, Monroe County against Urban Bistro for defaulting on the Lease, and against the Debtors and Lankford to recover pursuant to the Guaranty.

72.　On November 2, 2007 the New York court entered a default judgment in favor of Plaintiff against the Debtors for the amount of $740,923.62 (the "Judgment"). The Debtors did not appeal from the Judgment. Although the Judgment is final and the Debtors have admitted their liability to Plaintiff for this sum in their bankruptcy Schedules, the Court notes that it appears the amount of the Judgment is substantially in excess of what the Debtors should be liable for pursuant to the Guaranty, which was capped at one year's rent (approximately $75,000) plus costs in recovering this amount.

### CONCLUSIONS OF LAW

73.　Debtors are indebted to Plaintiff in the amount of $740,923.62 (the "Debt").

**Findings of Fact and Conclusions of Law**

74. The parties agree on the legal test to be applied here in determining if the Debt is dischargeable in the Case. The parties also agree that the burden of proving that the Debt is non-dischargeable under 11 U.S.C. § 523(a)(2)(B) is on the Plaintiff.

75. Thus, to prevail under section 523(a)(2)(B), the Plaintiff must prove, by a preponderance of the credible evidence, that the Debtors used a statement in writing

    (i)    that is materially false;

    (ii)    respecting the debtor's or an insider's financial condition;

    (iii)    on which the creditor to whom the debtor is liable for such money, property, services or credit reasonably relied; and

    (iv)    that the debtor caused to be made or published with intent to deceive,

thereby inducing the Plaintiff to enter into the Lease.

76. While certain of the elements of its claim have been established, the Court concludes that Plaintiff failed in its proof with respect to two of the required elements. Specifically, Plaintiff failed to prove by a preponderance of the credible evidence that (1) it reasonably relied upon the Financial Statement in making its decision to enter into the Lease with Urban Bistro, and (2) either Avner or Celeste published the Financial Statement with the intent to deceive Plaintiff.

77. Accordingly, the Debt is not excepted from the Debtors' discharge in the Case.

### End of Document ###